UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TOBY PALMER,

            Petitioner

       v.                           C-1-04-28

JAMES HAVILAND, WARDEN,

            Respondent

## ORDER

This matter was referred pursuant to 28 U.S.C. § 636 to the United States Magistrate Judge for consideration and report on the Petition for Writ of Habeas Corpus filed by the petitioner pursuant to 28 U.S.C. § 2254. The matter is before the Court upon the Report and Recommendation of the Magistrate Judge (doc. no. 11) recommending that the Petition for Writ of Habeas Corpus be denied with prejudice and upon petitioner's objections thereto (doc. no. 12).

REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this case through counsel seeking a Writ of Habeas Corpus pursuant to 28 U.S.C. §2254. This matter is before the Court upon the petition (Doc. 1), respondent's return of writ and exhibits thereto (Docs. 5, 6, 7), petitioner's traverse (Doc. 8), and respondent's reply to petitioner's traverse. (Doc. 9).

2

## I. Facts

This case involves the following facts as summarized in respondent's return of writ[1]:

On March 22, 2001, Jeffery Horton planned to visit his wife, Tammy, who had been admitted to the Good Samaritan Hospital in Clifton, Ohio for pregnancy complications. (Tr. 148–151). Around 9:00 or 10:00 that night, Tammy spoke with Jeffery on the phone and requested that he bring her dinner. (Tr. 151). Jeffery decided to stop for chicken at a fast food restaurant. (Tr. 152). While standing in line to place his order, Jeffrey struck up a conversation with Palmer and his accomplices, Darian and Robert Lattimore. (Tr. 153–154). Jeffrey then purchased his chicken and went back out to his 1988 Lincoln Town Car. (Tr. 157). As he was leaving, he noticed the same three men sitting in a maroon Ford Taurus wagon. (Tr. 158–159).

Jeffery ultimately arrived at the hospital parking garage. As he exited his car, the maroon Ford Taurus wagon suddenly pulled in front and boxed him in. (Tr. 159–160). While Palmer drove the Taurus, Robert and an armed Darian Lattimore commandeered the Lincoln. (Tr. 162–163). Declining Jeffrey's pleas to simply take the car, they held Jeffrey at gunpoint as they all drove off together. With Palmer following, the Lattimores ultimately took Jeffrey behind some apartment buildings

---

[1]    Petitioner does not generally contest the respondent's summary of facts and addresses the facts in the context of his argument. (Doc. 8 at 2).

3

in nearby Avondale.  Once there, the robbers took all of Jeffery's money and jewelry, and ordered him to take out the televisions in the car. (Tr. 166).

Jeffery's Lincoln was heavily customized. (Tr. 152). . . .  Upon hearing that the televisions and stereo equipment could not be removed without tools, Jeffrey was ordered into the trunk.  The trio then drove for quite some time before releasing Jeffrey at another location. (Tr. 170-171).  Once out, Jeffery observed Palmer and his accomplices ransacking the vehicle by removing speaker and stereo components from the trunk and interior.  At one point Jeffery was directed to remove his shoes, pants, jacket and two gold front teeth. (Tr. 176-178).

Believing he would not survive the robbery, Jeffery . . . grabbed Darian's gun and a struggle ensued. (Tr. 180-181).  During the struggle, the weapon discharged striking Darian in the shoulder. (Tr. 181).  Although Palmer and Robert Lattimore had been oblivious to the struggle while they were ransacking the car, upon hearing the gunshot they fled along with Darian. (Tr. 181-182).  Sensing an opportunity to escape, Jeffrey jumped into the Lincoln and sped off looking for help. (Tr. 182-183).

Meanwhile, Officer Chris Bihl and his partner were on patrol when they observed Jeffrey driving erratically before suddenly exiting the car and running toward the cruiser frantically waving his hands above his head and screaming for help. (Tr. 230-231).  Confronted with a shoeless hysterical person talking of a gun in the front seat of his car, the officers were initially startled. (Tr. 232).  They

4

handcuffed Jeffery and slowly pieced together what had happened that night. The interior of the Lincoln confirmed Jeffery's story, (Tr. 233–235), and the officers soon began to search for the maroon Taurus station wagon. (Tr. 241, 505). Detective David Feldhaus also contacted all hospitals to make sure he would be immediately informed if an individual was admitted with a gunshot wound. (Tr. 352).

[L]ater that night Darian Lattimore went to University Hospital for the treatment of a shoulder gunshot wound. (Tr. 353). A photo lineup was prepared and Darian was identified. (Tr. 355–356). The search for the maroon Taurus station wagon culminated the next morning when the vehicle was tracked down to its owner, Jaimee McClure, who had lent the car to her friends, Palmer and Robert Lattimore, the previous evening. (Tr. 278–282). Just after the shooting, Jaimee had been instructed to report the car stolen. (Tr. 291–292). Jaimee was on the phone with the 9-1-1 operator when Robert called her back and told her to "never mind." (Tr. 294–297).

Later still, Robert and Palmer came to Jaimee's apartment with some of their stolen goods. (Tr. 302–304). Jaimee listened as Robert and Palmer boasted about the night's events in separate phone conversations. (Tr. 306). Jaimee was told that the robbery started at the hospital, and that Robert and Palmer had thereafter placed Jeffrey in the trunk of his car. (Tr. 310–311). When the police initially spoke with Jaimee, she was reluctant to give any of this information, and instead lied by

claiming that a fictitious "Goldie" had stolen the car. (Tr. 318, 381–382). Detective Hoderlein was not easily deterred, and after further questioning and a search of her apartment, Jaimee admitted that Palmer and Robert Lattimore were the real persons involved. (Tr. 382–286).  Based on this information Detective Hoderlein prepared two more photo arrays, and Jeffery immediately identified Palmer and Robert as the other assailants. (Tr. 387–390).

(Doc. 5 at 4–6; Doc. 8 at 2).

II.  Procedural History

Petitioner was indicted by the Hamilton County Grand Jury in April 2001 on one count of aggravated robbery in violation of Ohio Rev. Code § 2911.01(A)(1), with a firearm specification, one count of robbery in violation of Ohio Rev. Code § 2911.02(A)(2), and one count of kidnapping in violation of Ohio Rev. Code § 2905.01(A)(2), with a firearm specification. (Doc. 5, Exh. A).

On August 14, 2001, a jury found petitioner guilty of aggravated robbery with a gun specification and guilty of robbery, but not guilty of kidnapping.  On August 28, 2001, the trial court sentenced petitioner to consecutive terms of incarceration of ten (10) years on the aggravated robbery conviction, eight (8) years on the robbery conviction, and three (3) years on the firearm specification conviction. (Doc. 5, Exh. B, Case No. B 0102212–B).

6

Represented by counsel, petitioner filed a timely appeal of his convictions

and sentences raising three assignments of error:

> 1. The trial court erred to the prejudice of Defendant-Appellant by failing to require [co-defendant] Darian Lattimore to testify pursuant to Defendant-Appellant's subpoena.

> 2. The trial court erred to the prejudice of Defendant-Appellant in failing to order a mistrial for prosecutorial misconduct during closing argument.

> 3. The trial court erred to the prejudice of Defendant-Appellant in imposing consecutive maximum sentences.

(Doc. 5, Exh. C).  The State filed a brief in response. (Doc. 5, Exh. D).  On July 12,

2002, the First District Court of Appeals issued an opinion affirming the trial

court's judgment and overruling petitioner's assignments of error. (Doc. 5, Exh.

E, Case No. C-010583).

Petitioner, through counsel, timely appealed to the Supreme Court of Ohio

and raised the following propositions of law:

> 1. When determining whether one offense is a lesser included offense of another offense, the potential relationship of the two offenses must be considered not only in the abstract terms of the defining statutes, but must also be considered in light of the particular facts of each case.

> 2.  It is inconsistent with the statutory guidelines for felony sentencing to impose a much harsher sentence against a less culpable co-defendant, because he proceeded to trial by jury.

> 3.  A prosecutor engages in prejudicial improper conduct when he repeatedly accuses the defendant of intimidating a witness, when such a claim was not supported by the state of the evidence, and the only purpose in doing so is to disparage his character in the presence of the jury.

7

> 4. A criminal defendant waives his Fifth Amendment privilege against self–incrimination when he enters a plea of guilty, as it relates to the criminal charge that he pled guilty to.

(Doc. 5, Exh. F). The State filed a memorandum in response. (Doc. 5, Exh. G). On

October 30, 2002, the Supreme Court of Ohio declined jurisdiction to hear the case

and dismissed the appeal as not involving any substantial constitutional question.

(Doc. 5, Exh. H, Case No. 02–1482).

On January 16, 2004, petitioner, through counsel, filed a Petition for Writ of

Habeas Corpus in this Court raising two grounds for relief:

> **Ground One**: Petitioner's right to be free from double jeopardy was violated when the state court punished him twice for the same offense, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.
>
> **Supporting FACTS**: A jury found that Petitioner robbed one person with a firearm. For this single act, Petitioner was convicted of robbery and aggravated robbery. The state court sentenced Petitioner to multiple punishments for the same offense . . . when the state court imposed maximum consecutive sentences for the aggravated robbery, the gun specification, and the robbery counts of the indictment.
>
> **Ground Two**: Petitioner was denied his right to due process when the prosecution engaged in repeated misconduct.
>
> **Supporting FACTS**: The prosecutor told Petitioner's jury that a witness's reluctance to testify was caused by Petitioner's threatening conduct towards the witness. As there was no evidence supporting this assertion, defense counsel's objections to the prosecutor's statement [were] sustained. Nonetheless, the prosecution repeated the assertion during examination and in closing argument in an effort to bolster the state's case. The prosecutorial misconduct denied Petitioner a fair trial and thus denied Petitioner due process of law.

(Doc. 1 at 4).

## II. Ground One of the petition is not procedurally defaulted, but should nevertheless be denied on the merits.

Petitioner's First Ground for relief asserts that the trial court violated his Fifth Amendment right to be free from double jeopardy and his Fourteenth Amendment right to due process by imposing multiple punishments for the same offense, *i.e.,* robbing one person with a firearm. Petitioner contends his convictions for aggravated robbery and robbery are based on the same set of facts and involved a single victim, and that he should have only been sentenced on one of the charges. Respondent contends that petitioner procedurally defaulted his First Ground for relief by failing to fairly present it as a federal claim in the state courts on direct appeal. Petitioner, in reply, contends that while his counsel relied on state law cases in the state courts of appeal, such state cases applied a constitutional analysis and thus fairly presented the federal constitutional claim to the state courts.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must first fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair

presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall*, 757 F.2d 94, 97, 99–100 (6th Cir.), *cert. denied*, 474 U.S. 831 (1985). If a petitioner fails to do so, he may have waived the unraised claims for purposes of federal habeas corpus review. *See Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989). If, because of a procedural default, a petitioner can no longer present his claims to a state court, he has waived them unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

It is well-settled that in order to satisfy the "fair presentation" requirement, a habeas corpus petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *cert. denied,* 532 U.S. 958 (2001); *Franklin v. Rose,* 811 F.2d 322, 325 (6th Cir. 1987). This means the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *Franklin,* 811 F.2d at 325 (citing *Koontz v. Glossa,* 731 F.2d 365, 368 (6th Cir. 1984)); *see also Prather v. Rees,* 822 F.2d 1418 (6th Cir. 1987).

10

A set of four guidelines has been developed for determining whether a claim was presented in such a way as to alert the court of the claim's federal nature. *McMeans,* 228 F.3d at 681. Under these guidelines, a petitioner may fairly present to the state courts the constitutional nature of his claim by (1) relying on federal cases employing constitutional analysis; (2) relying on state cases employing constitutional analysis in similar factual contexts; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *Id.*; *Franklin,* 811 F.2d at 326. The use of a "generalized catch-all phrase," which merely alleges the denial of a fair trial under the United States Constitution, does not adequately alert the state courts of the constitutional nature of the claim where the "only legal theory presented to the state courts was predicated entirely upon state evidentiary law." *Franklin,* 811 F.2d at 326. General statements that the petitioner was denied a "fair trial" and "due process" are not sufficient to put state courts on notice of a specific federal constitutional claim in the absence of citation to case law employing federal constitutional analysis. *McMeans,* 228 F.3d at 681. "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

11

In this case, respondent contends that "rather than assert a double jeopardy violation of constitutional dimensions, on direct appeal Palmer chose to limit his claim to an alleged state law violation of Ohio Revised Code Section 2941.25 as defined in *State v. Rance*, 85 Ohio St.3d 632 (1999)." (Doc. 5 at 10). Petitioner contends that by arguing the application of *Rance* to his case, he fairly presented his federal constitutional claim by way of a state court decision employing federal constitutional analysis in a similar fact pattern. The undersigned agrees with petitioner in this regard.

*Rance* involved the branch of the Double Jeopardy Clause that protects against multiple punishments for the same offense in relation to Ohio's "allied offenses" statute, Ohio Rev. Code § 2941.25. The defendant in *Rance* argued that the imposition of cumulative punishments in a single trial for two separate offenses that the defendant claimed constituted the same offense violated the Double Jeopardy Clause. The Supreme Court of Ohio addressed the specific issue of whether "R.C. 2941.25(A) and the constitutional protections against double jeopardy prohibit trial courts from imposing separate sentences for both involuntary manslaughter and aggravated robbery." 85 Ohio St.3d at 634, 710 N.E.2d at 702. The Ohio Supreme Court recognized that "the double jeopardy protections afforded by the federal and state Constitutions guard citizens against . . . cumulative punishments for the 'same offense.'" *Rance*, 85 Ohio St.3d at 634, 710 N.E.2d at 702. The Ohio Supreme Court noted that "the Fifth Amendment's

12

Double Jeopardy Clause (made applicable to the states by the Fourteenth Amendment) and Ohio's counterpart are sufficiently similar to warrant consultation of federal jurisprudence when analyzing Ohio's proscription against placing persons 'twice . . . in jeopardy for the same offense.'" *Id.* The *Rance* Court went on to analyze United States Supreme Court precedent on double jeopardy, including the decision in *Blockburger v. United States*, 284 U.S. 299 (1932)[2], relied on by petitioner in the instant case. 85 Ohio St.3d 632, 635, 710 N.E.2d 699, 702 citing *Ohio v. Johnson*, 467 U.S. 493, 499 (1984); *Missouri v. Hunter*, 459 U.S. 359, 366 (1983); *Albernaz v. United States*, 450 U.S. 333, 344 (1981). The Ohio Supreme Court in *Rance* ultimately determined that the Ohio legislature could prescribe imposition of cumulative punishments for crimes stemming from the same criminal act "without violating the federal protection against double jeopardy or corresponding provisions of a state's constitution." 85 Ohio St.3d 632, 635, 710 N.E.2d 699, 702 citing *Albernaz*, 450 U.S. at 344.

In the instant case, the Ohio court of appeals recognized the federal constitutional question raised by *Rance* when it stated, "While we may not consider the *Rance* test [comparing statutory elements in the abstract] to be the best approach for determining when charged offenses are allied offenses, because it fails to consider the individual facts of a case, as some courts have done when

---

[2] Under *Blockburger*, "The test to be applied to determine whether there are two offenses or only one [and thus whether multiple punishments are permissible under the double jeopardy clause of the Fifth Amendment], is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304.

13

applying the *Blockburger* test, we are bound, 'as an intermediary court, until the Ohio Supreme Court tells us otherwise, [to] apply the clearly defined test for cumulative punishments in *Rance*, no matter if we disapprove of the result reached.'" (Doc. 5, Exh. E at 5, footnotes omitted).  Likewise, the dissenting court of appeals judge recognized and addressed the double jeopardy issue when he wrote that "*Rance* is not just intuitively wrong, it is legally wrong.  The Ohio Supreme Court has the law of double jeopardy in jeopardy of disappearing. . . ." (Doc. 5, Exh. E at 7).  On appeal to the Ohio Supreme Court, petitioner urged the high court to revisit the issues raised by *Rance* so as "not [to] allow the principles that underlie the prohibition of double jeopardy to continue to be eroded." (Doc. 5, Exh. F at 2).  In view of the reliance of the Ohio court of appeals on *Rance* and the application of federal double jeopardy principles therein,  as well as petitioner's explicit arguments to the Supreme Court of Ohio concerning the effect of *Rance* on the arguable erosion of double jeopardy protections, the state court was given a fair opportunity to address the double jeopardy issue raised by petitioner's case and, therefore, his claim is properly before this Court.

In addressing the merits of petitioner's double jeopardy claim, the First District Court of Appeals, the last state court to issue a reasoned opinion on the claim, found the following:

> {¶ 8} In his third and final assignment of error, Palmer contends that the trial court erred by imposing maximum, consecutive sentences. We are unpersuaded.

14

{¶ 9} Palmer first argues that his convictions involved allied offenses of similar import, and thus that his sentences for aggravated robbery and robbery should have merged pursuant to R.C. 2941.25. We disagree.

{¶ 10} In *State v. Rance*, the Ohio Supreme Court held that two statutory offenses are allied offenses of similar import if the elements of each offense "correspond to such a degree that the commission of one crime will result in the commission of the other." The *Rance* test requires a strict textual comparison of the statutory elements, without reference to the particular facts of the case, to determine whether one offense requires proof of an element that the other does not. If there are differing elements, the inquiry ends, and multiple convictions and sentences are allowed.

{¶ 11} Although Palmer acknowledges that this court, in *State v. Norman* and *State v. Berry*, applied the *Rance* test and determined that aggravated robbery and robbery are not allied offenses because each offense requires proof of an element that the other does not, he asks us to reconsider those decisions in light of *State v. Grant*. In *Grant*, a panel of this court commented that the Ohio Supreme Court, in *State v. Fears*, had appeared to have implicitly overruled *Rance*.

{¶ 12} This court has already addressed that concern, holding that, despite the comment in *Grant*, *Berry* and *Norman* remain controlling because the Ohio Supreme Court has not explicitly overruled *Rance* and has not specifically addressed whether aggravated robbery and robbery are allied offenses. Furthermore, we note that the Ohio Supreme Court continues to use the *Rance* test without citation to *Fears*.

{¶ 13} While we may not consider the *Rance* test to be the best approach for determining when charged offenses are allied offenses, because it fails to consider the individual facts of a case, as some courts have done when applying the *Blockburger* test, we are bound, "as an intermediate appellate court, until the Ohio Supreme Court tells us otherwise, [to] apply the clearly defined test for cumulative punishments in *Rance*, no matter if we disapprove of the result reached." Accordingly, as robbery and aggravated robbery are not allied offenses on the basis of *Rance*, the trial court properly imposed multiple sentences.

(Doc. 5, Exh. E at 4–6, footnotes omitted).

15

The factual findings of the state appellate court are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). *See McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). In addition, the decision of the Ohio Court of Appeals is binding on this Court unless it is contrary to clearly established law or was based on an unreasonable determination of the facts of record. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104– 132, 110 Stat. 1214 ("AEDPA"), a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits in state court unless the adjudication either:

1.   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrases "contrary to" and "unreasonable application" have independent meanings:

A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the law set forth in ... [Supreme Court] cases, or if it decides a case differently that we have done on a set of materially indistinguishable facts. The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies it to the facts of a particular case. The focus on the latter inquiry is whether the state court's application of clearly established federal law is objectively unreasonable ... and an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002)(citation omitted).  Upon review of the entire record, this Court concludes that petitioner has failed to establish that the findings of the state appellate court are unreasonable as to justify federal habeas corpus relief.  *See Williams v. Taylor*, 529 U.S. 362 (2000).

The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Constit. amend. V.  This guarantee against double jeopardy, made applicable to the states through the Fourteenth Amendment, *Benton v. Maryland,* 395 U.S. 784, 794 (1969), among other things, protects against "multiple punishments for the same offense" imposed in a single proceeding. *Missouri v. Hunter,* 459 U.S. 359, 366 (1983) (quoting *North Carolina v. Pearce,* 395 U.S. 711, 717 (1969)).  In the "multiple punishment" context, the Double Jeopardy Clause's protection is "limited" to ensuring that "sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Jones v. Thomas,* 491 U.S. 376, 381 (1989); *see also Ohio v. Johnson,* 467 U.S. 493, 499 (1984); *Brown v. Ohio,* 432 U.S. 161, 165 (1977).  The Double Jeopardy Clause does not prohibit a state from defining one act of conduct to constitute two separate criminal offenses. "Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double  Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent." *Ohio v. Johnson*, 467 U.S. at 499 (citations omitted).

17

The "same elements" test established  in *Blockburger v. United States,* 284 U.S. 299, 304 (1932), *i.e.,* "whether each [statutory] provision requires proof of a fact which the other does not," is normally used in federal criminal cases to determine whether two offenses are sufficiently different to allow the imposition of cumulative punishment. *Johnson,* 467 U.S. at 499 n.8; *see also Brown,* 432 U.S. at 166.  The *Blockburger* test, a rule of statutory construction for federal statutes, does not necessarily control the inquiry into the intent of a state legislature. *Johnson,* 467 U.S. at 499 n.8; *Banner v. Davis,* 886 F.2d 777, 780–82 (6th Cir. 1989).  Instead, when assessing the intent of a state legislature, the federal courts must defer to and are bound by the state courts' construction of their own statutes. *Hunter,* 459 U.S. at 368 (citing *O'Brien v. Skinner,* 414 U.S. 524, 531 (1974)); *see also Johnson,* 467 U.S. at 499; *Brown,* 432 U.S. at 167; *Banner,* 886 F.2d at 780.  A state legislature may create substantive crimes and punishments that overlap to some degree without violating the Double Jeopardy Clause. *Missouri v. Hunter*, 459 U.S. 359 (1983).  "Even if the crimes are the same under *Blockburger,* if it is evident that a state legislature intended to authorize cumulative punishments [for them, the federal] court's inquiry is at an end." *Johnson,* 467 U.S. at 499 n.8; *see also Hunter,* 459 U.S. at 368–69 ("Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*, a court's task of statutory construction is at an end and the

18

prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial" without violating the Double Jeopardy Clause.); *Banner,* 886 F.2d at 780–82.

The Ohio legislature's intent in the multiple punishment area may be discerned from the state multiple–count statute, Ohio Rev. Code § 2941.25. *See State v. Rance,* 85 Ohio St.3d 632, 635, 710 N.E.2d 699, 703 (1999); *see also Jones v. Baker,* 35 F.3d 566 (6th Cir. 1994) (unpublished), 1994 WL 464191, at **3, *cert. denied,* 513 U.S. 1164 (1995); *Woodfork v. Russell,* 19 F.3d 20 (6th Cir. 1994)(unpublished), 1994 WL 56933, at **2. The statute provides:

> (A) Where the same conduct by [the] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

The Ohio Supreme Court has held that this provision permits the trial court to convict and impose cumulative sentences for two or more offenses arising from the same incident if the offenses (1) are of dissimilar import; or (2) are of similar import, but were committed separately or with separate animus. *Rance*, 85 Ohio St.3d at 636, 710 N.E.2d at 703. The applicable test for deciding the issue

19

potentially involves a two-step analysis under the state statute. First, if the statutory elements of the various crimes, considered "in the abstract" without regard to the particular facts of the case, are found to be of dissimilar import because they do not "correspond to such a degree that the commission of one crime will result in the commission of the other," the multiple convictions and punishments are permitted and the court's inquiry ends. 85 Ohio St.3d at 638, 710 N.E.2d at 704. On the other hand, if the offenses are found to be of similar import, the second level of inquiry is triggered requiring the court to determine whether or not the defendant may be cumulatively punished for them because, as a factual matter, they were committed separately or with a separate animus. *See id.; see also State v. Jones*, 78 Ohio St.3d 12, 13-14, 676 N.E.2d 80, 81-82 (1997). This determination does not turn on "the presence or absence of any specific factors," but rather is based on the particular facts of each case as gleaned from the record. *Jones*, 78 Ohio St.3d at 13-14, 676 N.E.2d at 81-82.

In this case, the Ohio Court of Appeals addressed the first step of the *Rance* analysis, concluding that the aggravated robbery and robbery counts charged against petitioner are not allied offenses of similar import when viewed "in the abstract" because each offense requires proof of an element that the other does not. (Doc. 5, Exh. E at 5). Under Ohio Rev. Code § 2911(A)(1), "aggravated robbery" requires proof that while committing a theft offense, the offender had a deadly weapon and brandished it. Under Ohio Rev. Code § 2911.02(A)(2),

"robbery" requires proof that while committing a theft offense, the offender threatened or attempted to inflict physical harm on another. Aggravated robbery requires proof of brandishing a deadly weapon, while robbery requires proof of the threat of physical harm. Alignment of the statutory elements "in the abstract" shows each crime requires proof of an element the other does not. The Ohio Court of Appeals noted this finding was in accord with its previous decisions in *State v. Norman,* 137 Ohio App.3d 184, 738 N.E.2d 403 (Ohio App. 1st Dist. 1999)( "An element of aggravated robbery, brandishing the weapon, is not required to prove the commission of robbery; conversely, a threat of physical harm is not required to prove aggravated robbery.") and *State v. Berry*, Case Nos. C–990354, C–990365, and B–9609565, 2000 WL 376409 (Ohio App. 1st Dist. Apr. 14, 2000). Accordingly, the court of appeals upheld the trial court's imposition of multiple sentences in petitioner's case.

Nevertheless, in petitioner's case, as in *Norman*, the First District Court of Appeals expressed its disapproval of applying the *Rance* test of analyzing charges of robbery and aggravated robbery "in the abstract" instead of in light of the actual facts of the case because of the seemingly incongruous results. (Doc. 5, Exh. E at 5); *Norman*, 137 Ohio App.3d at 203, 738 N.E.2d at 416. As noted by the Ohio court of appeals in *Norman*, while "brandishing a deadly weapon [arguably] 'encompasses' the threat to inflict physical harm, the Ohio Supreme Court could not have been more definite in its mandate to compare the elements 'in the

21

abstract,' and not 'in light of the particular facts in the case.' *Rance*, 85 Ohio St.3d at 636, 638, 710 N.E.2d at 703, 704." *Norman*, 137 Ohio App.3d at 203, 738 N.E.2d at 416. In the instant case, as in *Norman*, the court of appeals expressed its obligation as a lower court to follow *Rance* until the Supreme Court of Ohio directs otherwise despite its disapproval of the results obtained. (Doc. 5, Exh. E at 5). The undersigned acknowledges that the Ohio Supreme Court in *Rance* intended to provide a bright line rule for determining when offenses are allied for double jeopardy purposes by examining the statutory elements of each crime charged "in the abstract." *See Rance*, 85 Ohio St.3d at 636, 710 N.E.2d at 703. Nevertheless, like the First District Court of Appeals, the undersigned disapproves of the result reached in this case by applying the *Rance* test without reference to the particular facts of the case.[3] However, as discussed above, this federal court on habeas corpus review is bound by the Ohio courts' interpretation of the state criminal statutes as showing that the aggravated robbery and robbery offenses are offenses of dissimilar import separately punishable under Ohio Rev. Code § 2941.25. *See Hunter*, 459 U.S. at 368; *O'Brien v. Skinner*, 414 U.S. 524, 531 (1974). In this case, the Ohio courts have concluded that the General Assembly intended to impose multiple punishments for petitioner's offenses of robbery and aggravated robbery. This is a factual finding that is binding on this Court. Each offense is distinct, with its own elements, and charging each separately is not foreclosed on the basis that

---

[3] For this reason, the Court recommends that a certificate of appealability be issued on petitioner's double jeopardy claim.

the robbery offense is a lesser included offense of the aggravated robbery offense. The record thus reflects that petitioner was properly convicted and sentenced on the aggravated robbery and robbery charges as a matter of Ohio law such that no double jeopardy violation has occurred. Accordingly, this Court concludes that under the applicable standard of review set forth in 28 U.S.C. § 2254(d) the Ohio Court of Appeals' challenged adjudication of petitioner's double jeopardy claim was neither contrary to nor involved an unreasonable application of clearly established federal law as determined by the Supreme Court in addressing double jeopardy "multiple punishment" violations and was reasonable in light of the evidence presented at petitioner's state criminal trial. Therefore, petitioner is not entitled to federal habeas relief based on the double jeopardy claim alleged in Ground One.

## III. Ground Two of the petition is without merit.

Petitioner's Second Ground for relief asserts his right to due process was violated when the prosecution engaged in repeated misconduct. Petitioner contends that during the trial, the prosecutor incorrectly asserted that a witness had been frightened to testify against petitioner. The trial court sustained defense counsel's objections to the comments. Nonetheless, the prosecution continued to argue that the witness' reluctance was based upon her fear of petitioner. Petitioner claims the prosecutorial repeated misrepresentations denied him a fair trial and due process of law.

23

Petitioner contends that "[t]he prosecutor's repeated assertions, even after the trial court sustained an objection, had a significant impact upon the jury because his stubborn refusal to drop the claim suggested tat he knew something that the trial court did not.  The appellate court's conclusion that Palmer was not prejudiced in part because the trial court offered 'curative instructions' is unreasonable." (Doc. 8 at 7).  While petitioner's traverse fails to cite to any specific portions of the record in support of this claim, his brief before the Ohio court of appeals identified the portions of the record to which he objects.  During closing argument, the prosecutor argued that the testimony of Jaimee McClure, a co-defendant, was worthy of belief because McClure testified at the trial despite being frightened by defendant's threats against her:

> Prosecutor: Folks, they can beat up on Jaimee McClure all they want, but she is the linchpin to this case.  Without any knowledge of what Jeffrey Horton had said, she tells you exactly the same thing: First, on the morning of March 23rd to the officers, and then last week from that witness stand to you.  Was she scared?  You bet she was.  She didn't want to be here.  She wanted to be anywhere but here.  As I close, let me just tell you this.  I want you to think why was she scared?  Well, that's her friend.  She knows Toby Palmer.  She knows Toby Palmer, and she's scared of him.
>
> Defense Counsel: Objection.
>
> The Court: Sustained.
>
> Prosecutor: What does that tell you?
>
> The Court: Sustained.

24

> Prosecutor: Well, ladies and gentlemen, let me ask you this.  If a person would rob someone at gunpoint, if a person would put someone in a trunk and threaten their life over a few pieces of jewelry, what would that person do to someone who testified against him in a court of law?
>
> Defense Counsel: Objection.
>
> The Court: Sustained.
>
> Prosecutor: Does she have a right to be scared of Toby Palmer?  Absolutely.  The question is: Was she truthful?  Does her testimony corroborate the testimony of Jeff Horton?  Undoubtedly.

(Tr. 780–81).

Petitioner argues that McClure did not testify she was frightened of or had been threatened by petitioner, and that the prosecutor's statements to the contrary mislead the jury.  The relevant testimony is as follows:

> Q.  What was so bad that happened here this morning, Jaimee, that made you come into court and tell this judge, "I don't want to testify"?  What was so bad about getting on that stand and telling these folks the truth?  What would make you not want to do that?
>
> A. I consider me and Mr. Palmer friends and I don't – I don't know. I don't believe he would do anything to hurt myself or my child, but I just don't feel – telling on somebody or getting up on the stand, I felt I was going to put myself at risk. I haven't been threatened or anything. I just felt I was putting myself at risk and my child and my unborn child, and I didn't want to do that.
>
> Q.  When you say at risk, you're talking about your personal safety?
>
> A. Yes.
>
> Q. You have some concerns about going home after you testify?

25

> A. Not really. I just don't want to always be looking over my shoulder, thinking something's going to happen.

(Tr. 340).

The Ohio court of appeals, the last court to issue a reasoned opinion on this issue, found as follows:

> {¶ 6} In his second assignment of error, Palmer maintains that the trial court erred by failing to declare a mistrial based upon prosecutorial misconduct. Palmer asserts that the assistant prosecutor engaged in misconduct when he asserted, during closing argument, that one of the state's witnesses had been scared to testify because of threats she had allegedly received from Palmer.  We find this assignment of error unpersuasive.

> {¶ 7} Although Palmer did not request a mistrial following the prosecutor's comments, he did object to the alleged misconduct and thus preserved this issue for appeal.  Prosecutorial misconduct constitutes reversible error only when the conduct complained of has deprived the defendant of a fair trial.  Here, although the witness did express some reluctance to testify, we conclude that it was improper for the prosecutor to continue to argue that the witness's reluctance was based on a fear of Palmer after the trial court had sustained Palmer's objections to those comments.  Nevertheless, our review of the record convinces us that Palmer's substantial rights were not affected by the prosecutor's remarks.  The trial court sustained the objections and gave a curative instruction to the jury.  Furthermore, based on the strength of the evidence against Palmer, we cannot say that the prosecutorial misconduct denied Palmer a fair trial.  Accordingly, the second assignment of error is overruled.

(Doc. 5, Exh. E at 3-4, footnotes omitted).

To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  "Even if the prosecutor's conduct was

'undesirable or even universally condemned,' this Court can only provide relief if the [conduct was] so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process violation." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). The reviewing court's focus in a claim of prosecutorial misconduct is "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982). A prosecutor's alleged misconduct must be examined within the context of the entire trial to determine whether it deprived a defendant of a fair trial. *United States v. Young,* 470 U.S. 1, 11–12 (1985). "Reversal is required only if the prosecutor's misconduct is 'so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant.'" *Lundgren v. Mitchell*, __ F.3d __, 2006 WL 589356, *19 (6th Cir. March 13, 2006), quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997).

The Sixth Circuit has adopted a two-part test for determining whether prosecutorial misconduct violates a defendant's due process rights. *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases). First, the court must determine whether the challenged statements were indeed improper. *Id*. at 452. Upon a finding of impropriety, the court then determines if the statements were flagrant. *Id*. The Court considers four factors in determining flagrancy: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3)

27

whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. *Bowling v. Parker*, 344 F.3d 487, 512–13 (6th Cir. 2003); *Macias*, 291 F.3d at 452. *See also Darden,* 477 U.S. at 182; *Young,* 470 U.S. at 12; *Donnelly*, 416 U.S. at 646–647. Other relevant factors include whether the prosecutor manipulated or misstated the evidence, *see Darden,* 477 U.S. at 182; *Berger v. United States,* 295 U.S. 78, 84–85 (1935), *overruled on other grounds by Stirone v. United States,* 361 U.S. 212 (1960), or whether a curative instruction was given by the trial judge, *see Darden,* 477 U.S. at 182.

In the instant case, the court of appeals found the prosecutor's conduct in closing argument amounted to prosecutorial misconduct. (Doc. 5, Exh. E at 3–4). This a finding of fact that is presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). In closing argument, a prosecutor is allowed "to argue reasonable inferences from the evidence," *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000), but not permitted to misstate the evidence. *Macias*, 291 F.3d at 452. Thus, during closing argument, it is impermissible for the prosecuting attorney "to bring to the attention of the jury any purported facts that are not in evidence and are prejudicial." *Macias*, 291 F.3d at 452 (quoting *Byrd*, 209 F.3d at 535). The court of appeals' finding of prosecutorial misconduct is a reasonable conclusion drawn from and supported by the record. Nevertheless, the prosecutor's comments during closing arguments were not so flagrant as to render the entire trial fundamentally unfair.

28

While the statements were indeed improper, the three statements that McClure was scared, in the context of the entire trial, were not so extensive so as to prejudice petitioner.  The prosecutor's comments occurred during rebuttal closing argument, and petitioner does not contend that the prosecutor acted inappropriately at any other point during the trial.  Because the comments were isolated, this factor does not weigh in petitioner's favor.  In addition, the trial court sustained petitioner's objections to these statements and, in instructing the jury, admonished the jury to disregard statements to which the court sustained the objections thereto. (Tr. 780, 784).  Juries are presumed to follow an instruction absent an "overwhelming probability" the jury will be unable to follow the instruction. *Greer v. Miller*, 483 U.S. 756, 767 n. 8 (1987); *United States v. Ford*, 872 F.2d 1231, 1239 (6th Cir.1989).  Petitioner has not overcome this presumption and the trial court's instruction lessened the impact of the prosecutor's improper statements. *Darden*, 477 U.S. at 181–82.  Also, as the Ohio Court of Appeals reasonably found, the evidence against petitioner was strong.  Moreover, it is highly unlikely that the jury would have been misled by the three references to Ms. McClure's fear of testifying and would have entered a guilty verdict on the aggravated robbery and robbery charges without finding that the State had met its burden of proving each element of the offenses beyond a reasonable doubt.[4]   In this Court's review of the habeas corpus petition, "the

---

[4]     In fact, petitioner was acquitted of the kidnapping charge despite the alleged prosecutorial misconduct.

29

relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 411 (2000)." *Macias*, 291 F.3d at 454. The relevant factors discussed above weigh against a finding of flagrancy and the determination of the Ohio court of appeals that the prosecutor's comments did not violate petitioner's due process rights was not objectively unreasonable. Petitioner has failed to demonstrate the prosecutor's challenged statements in closing argument deprived him of a fair trial. Accordingly, petitioner is not entitled to habeas corpus relief based on the prosecutorial misconduct claim alleged in Ground Two of the petition.

## CONCLUSION OF THIS COURT

Upon careful consideration of the petitioner's objections, and upon conducting a *de novo* review of the record, especially in light of petitioner's objections, the Court finds that petitioner's contentions have either been adequately addressed and properly disposed of by the Judge or present no particularized arguments that warrant specific responses by this Court. The Court finds that the Judge has accurately set forth the controlling principles of law and properly applied them to the particular facts of this case and agrees with the Judge that petitioner's convictions and sentences were fundamentally fair and do not violate the Constitution of the United States of America.

30

Accordingly, the Court accepts the factual findings and legal reasoning of the Magistrate Judge and hereby **ADOPTS** his Report and Recommendation dated April 5, 2006.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) is **DENIED WITH PREJUDICE.**

A certificate of appealability shall issue with respect to the constitutional claim alleged in Ground One of the petition because reasonable jurists could debate whether this claim should have been resolved in a different manner and, alternatively, whether the issue presented in this ground for relief is "adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (in turn quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)).  A certificate of appealability shall not issue with respect to the claim alleged in Ground Two of the petition because petitioner has failed to make a substantial showing of the denial of a constitutional right based on this claim.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

31

With respect to any application by petitioner to proceed on appeal *in forma pauperis*, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and therefore **GRANTS** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

**IT IS SO ORDERED.**


      s/Herman J. Weber     
Herman J. Weber, Senior Judge
United States District Court